UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

FRANK EGAN,

                Plaintiff,

    - against -

NEW YORK CITY, POLICE OFFICER
MELVIN CHITTUM and POLICE
OFFICER CESAR POLANCO,
individually, and in their capacity as
members of the New York City Police
Department,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 1479 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Frank Egan brings claims under Section 1983 against the City of New

York (the "City") and two officers of the New York City Police Department ("NYPD") – Melvin

Chittum and Cesar Polanco – for false arrest, malicious prosecution, and denial of fair trial

rights. Plaintiff's claims arise out of his arrest on March 9, 2015, for allegedly shining a laser

pointer at aircraft landing and departing from LaGuardia Airport.

        Officer Chittum and Sergeant Polanco ("Defendants") have moved for summary

judgment arguing, inter alia, that they had probable cause to arrest Plaintiff pursuant to the

doctrine of constructive possession.[1] In a September 30, 2018 short form order, this court denied

Defendant Polanco's motion as to Plaintiff's false arrest, malicious prosecution, and denial of

fair trial claims, and denied Defendant Chittum's motion as to Plaintiff's false arrest and

---

[1] The City represents that Plaintiff's counsel has stated that he will move for voluntary dismissal
as to the City. (Def. Br. (Dkt. No. 35) at 10 n.1) Plaintiff has not responded to this assertion,
and neither side has briefed Plaintiff's claims as to the City.

malicious prosecution claims. The Court granted Defendant Chittum's motion as to Plaintiff's denial of fair trial claim. The purpose of this memorandum opinion is to set forth the Court's reasoning.

## BACKGROUND

### I.    FACTS[2]

#### A.    Unlawful Use of a Laser Pointer

At the time of the incident at issue, Plaintiff Frank Egan was 36 and resided at 2801 Coddington Avenue in the Bronx. (See Siddiqi Decl., Ex. F (Egan Dep.) (Dkt. No. 34-6) at 18, 28)

Defendant Melvin Chittum has been an NYPD officer since 2006. (Siddiqi Decl., Ex. E (Chittum Dep.) (Dkt. No. 34-5) at 3-4) Defendant Cesar Polanco has been an NYPD officer since 2003. (Anderson Decl., Ex. 1 (Polanco Dep.) (Dkt. No. 40-1) at 3)

On March 9, 2015, NYPD Detective Richard Mardarello and Police Officer Royce Charles were assigned to the NYPD's Aviation Unit and were on patrol in an NYPD helicopter. (Def. R. 56.1 Stmt. (Dkt. No. 36) ¶ 1; see Siddiqi Decl., Ex. A (Mardarello Dep.) (Dkt. No. 34-1) at 8) Detective Mardarello was piloting the helicopter, and Officer Charles was the co-pilot. (Id. ¶ 2) The officers received a radio report that there was a laser being pointed at commercial aircraft landing and departing from LaGuardia Airport. At 8:05 p.m., the captain of

---

[2] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disputes Defendants' characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

2

American Airlines Flight 1152 observed a green laser light in the cockpit. The light distracted him and caused him to lose focus on his flight instruments. (Id. ¶¶ 3-4; see also Siddiqui Decl., Ex. H (Criminal Complaint) (Dkt. No. 34-8) at 2) At 8:06 p.m., the first officer of Shuttle America Flight 5921 observed a green light that illuminated the cockpit. He lost focus on the flight instruments and suffered pain in his right eye and head. (Id. ¶ 5) At 8:52 p.m., the first officer of Air Canada Flight 727 observed a green light that lit up the entire cockpit, causing him to suffer flash blindness for 3 to 5 seconds in his right eye, and to lose focus on flight instruments. He was treated at a Toronto hospital for eye irritation and burning. (Id. ¶ 6)

Mardarello and Charles flew to the vicinity of the complaint area, and eventually observed a green laser beam about 1.5 miles away. (Id. ¶ 8) The light hit the cockpit of the helicopter, and Detective Mardarello was temporarily blinded. (Id. ¶ 9) The officers were able to pilot the aircraft toward the source of the laser beam, and were able to pinpoint the origin of the light – 2801 Coddington Avenue in the Bronx. (Id. ¶¶ 10-12) Detective Mardarello maintained a position 300 to 400 feet in the air, across the street from that location. The officers in the helicopter were able to determine the window from which the laser beam was being pointed. (Id. ¶¶ 13-14)

Officer Charles contacted a nearby NYPD precinct, and at approximately 9:20 p.m., Officer Chittum and Officer Lopez (not a party to this litigation) received a radio communication directing them to 2801 Coddington Avenue. (Id. ¶¶ 15-16) The officers arrived at that location, and were joined a short time later by their supervisor – Sergeant Cesar Polanco. (Id. ¶ 17) The three officers entered the building, went to the apartment from which the laser was being shone, and knocked on the apartment door. A woman opened the door, and the three officers entered the apartment. (Id. ¶¶ 18-19)

Plaintiff had been in the apartment since about 8:05 p.m. Plaintiff's mother, sister, and his sister's boyfriend – Elehecer Balaguer – were also inside the apartment. (Id. ¶¶ 20-21; Egan Dep. (Dkt. No. 34-6) at 28-29)

## B. Plaintiff's Account of the Arrest

According to Plaintiff, after he returned to the apartment, he ate dinner, went into his bedroom, turned on the TV, and dozed off at about 8:20 or 8:25 p.m. (Egan Dep. (Dkt. No. 34-6) at 43-44) Plaintiff was wearing jeans and a blue shirt. (Id. at 49) Plaintiff was woken by his sister, who said that police were banging on the door and wanted to talk to him. (Id. at 46-47) As Plaintiff woke up he saw a "light flashing through my window, shooting from on top of the building across the street. It was shooting . . . into my room." (Id. at 46) He opened his bedroom window and observed two police cars and a helicopter outside. Plaintiff then left his bedroom, passed through the living room, and entered the kitchen, where police officers were waiting. (Id. at 46-47) When he entered the kitchen, "[t]he cops asked me questions. They stated that I did something. That I was shooting a laser or something like that. They're telling me that this is yours, I'm lying, this and that." (Id. at 48) The officers told Plaintiff that they had found a laser on top of the refrigerator and stated that "it's yours." Plaintiff said "no, it's not." (Id. at 56) The police officers accused him of hiding in the apartment, and stated that he hadn't been sleeping, because he was in his work clothes. (Id. at 49)

Officer Chittum accused Plaintiff of shining the laser pointer. (Id. at 55) Officer Chittum then told Plaintiff that the officers were going to ask him questions downstairs, and Plaintiff agreed. (Id.) Plaintiff was then handcuffed by Chittum and taken to the 45th Precinct. (Id. at 56, 58)

4

## C.  **Defendants' Account of the Arrest**

Officer Chittum testified that as he approached Plaintiff's apartment, the officers in the helicopter shone a spotlight on the window that was the source for the laser beam. The window was in Plaintiff's bedroom. (Chittum Dep. (Dkt. No. 34-5) at 17-18)

Officer Chittum testified that as the officers entered the apartment, Plaintiff "came out from the living room area, and then [Polanco] was engaged in conversation with [Plaintiff.]" (Chittum Dep. (Dkt. No. 34-5) at 11) Three other individuals came from the "far back left bedroom." All four occupants of the apartment were then in the living room. (Id. at 12) Chittum said that as Balaguer came out of the bedroom, it appeared that he had been sleeping. (Id. at 17)

Officer Chittum then observed a laser device on the top of a "very short" refrigerator. (Id. at 12) Chittum operated the laser at some point while he was in the apartment. (Id.) Balaguer told Officer Chittum that he had "bought [the laser] in Florida when he was down in Florida." (Id. at 12-13)

Chittum also spoke with Plaintiff's mother and sister: the "mom was emotionally upset because of her health condition, and her daughter, she was . . . totally out of it. She was very [un]responsive when [Officer Chittum] tried to speak to her." (Id. at 13) Plaintiff told the officers that he had been watching TV and fell asleep. (Id.)

Sergeant Polanco instructed Officer Chittum to take Plaintiff into custody and Plaintiff was brought outside. (Id.) Officer Chittum testified that the officers in the helicopter "pointed [Plaintiff] out[] as the one operating the laser. . . . They informed us over the radio that he was the – it was confirmed of him having the laser. . . . They were instructing us that he was the one with the laser." (Id. at 13-14)

Sergeant Polanco testified that as the officers approached the apartment building, the officers in the helicopter said "they were going to point at the window where the light or where the laser was coming from." (Polanco Dep. (Dkt. No. 40-1) at 18) The officers then entered the apartment building and proceeded to the apartment identified by the officers in the helicopter. A woman admitted them to that apartment. (Id. at 19) According to Sergeant Polanco, the officers "kept asking her if there was somebody else in the apartment[,] [a]nd then her son comes out from the room." (Id. at 20) Sergeant Polanco testified that he did not see anyone else before Plaintiff came out from one of the bedrooms, and he does not recall that anyone else was in the apartment. (Id.) Polanco said that while he was inside the apartment, the officers in the helicopter shone a light on the same window they had before, and that window was in the kitchen. (Id.) According to Sergeant Polanco, he "stuck [his] hand out to make sure that was the right window, . . . which they confirmed." (Id. at 20)

As Sergeant Polanco walked back from the kitchen window, he saw a "black metal pipe type" object. "Laser" was written on the pipe in small red letters. He picked up the black pipe and pressed it, and it emitted a green light. (Id.) Plaintiff came out of a bedroom "once [Sergeant Polanco] found the laser." (Id.) Polanco asked, "[w]as anybody using this" or "[w]ho owns this" and Plaintiff responded "me." (Id. at 21) Plaintiff then stated, "I don't understand what's going on. Why are you guys here?" (Id.) The officers then handcuffed Plaintiff and walked him outside. (Id.)

Sergeant Polanco then asked the officers in the helicopter, "[i]s this the man that was pointing the laser," and someone responded "yes" over the radio. (Id. at 21)

Officer Charles testified that once the precinct officers arrived on the scene, they asked him where the laser light was coming from. Charles directed the officers to a particular

6

window. (Charles Dep. (Dkt. No. 34-2) at 10) Once the officers were inside, they went to a particular window, and asked him to confirm that that was the window from which the laser light was shining. Charles confirmed that it was. (Id. at 11) Officer Charles could not see inside any of the windows, however. (Id. at 10) Officer Charles further testified that the officers subsequently came out of the apartment building with an individual in custody. Officer Charles "couldn't see who it was exactly." The precinct officers said "they have one under arrest and that's it." (Id. at 11)[3]

## D. Criminal Complaint, Arraignment, and Disposition

Officer Chittum was the arresting officer, and he completed and entered into an NYPD database an NYPD Omniform System Arrest Report and Complaint. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶¶ 35-36; see also Siddiqi Decl., Ex. D (Arrest Report) (Dkt. No. 34-4); Anderson Decl., Ex. 3 (Omniform Complaint) (Dkt. No. 40-3)) Officer Chittum also met with a prosecutor at the Bronx District Attorney's Office the day after the arrest, and gave a statement. (Chittum Dep. (Dkt. No. 34-5) at 15) Although Officer Chittum was not the deponent for the criminal complaint (see Criminal Complaint (Dkt. No. 34-8)), he signed a Supporting Deposition in which he swore that the facts he furnished for the criminal complaint "are true." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 37; see also Anderson Decl., Ex. 4 (Supporting Deposition) (Dkt. No. 40-4))

Sergeant Polanco testified that he provided details concerning "[t]he specific[s] of the crime" to the Bronx District Attorney's Office "a week after the event" (Polanco Dep. (Dkt.

---

[3] Detective Mardarello – who was piloting the helicopter – could not recall having any communication with the police officers on the ground. (Mardarello Dep. (Dkt. No. 34-1) at 16)

No. 40-1) at 25),[4] and that this communication was the only communication he had with the District Attorney's Office. (Id. at 25-26) It is undisputed that, in speaking with the District Attorney's Office, Polanco "provided information to the prosecutor that Mr. Egan made the statement 'that's mine'" in reference to the laser pointer. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 38; Def. R. 56.1 Reply (Dkt. No. 42) ¶ 12; Def. Reply (Dkt. No. 41) at 11 (arguing that "plaintiff cannot demonstrate that Sgt. Polanco 'commenced or continued' criminal proceedings against plaintiff by telling the prosecutor that plaintiff said 'that's mine' regarding the laser pointer")) Sergeant Polanco's assertion that Plaintiff told him that the laser pointer was his appears in (1) a Notice of Statement issued by the District Attorney's Office pursuant to N.Y. Crim. Pro. L. § 710.30(1)(a),[5] which reports that, in response to a "pre-arrest, pre-Miranda . . . investigative question," Plaintiff stated, "that's mine" (Anderson Decl., Ex. 5 (Notice of Statement) (Dkt. No. 40-5) at 1-2); and (2) a "District Attorney Complaint Report Form" (Siddiqi Decl., Ex. C (Dkt. No. 34-3)), which states that "[a]s [Plaintiff] exited the [bed]room, PO Chittum observed a laser pointer in plain view on top of a refrigerator next to the window. Sgt. Polanco then held up the laser pointe[r] and the defendant stated in sum and substance: OH THAT'S MINE. Defendant arrested." (Id. at 2 (emphasis in original))

---

[4] Although Polanco testified that his communications with the District Attorney's Office took place a week after the incident, he also testified that he "saw in the news later[] [that another] person . . . [had] confessed to [the crime] during arraignment" (id. at 26), suggesting that his communications with the District Attorney's Office took place prior to arraignment.

[5] Criminal Procedure Law § 710.30(1) states that "[w]henever the people intend to offer at a trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible . . . , they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered." N.Y. Crim. Pro. L. § 710.30(1).

On March 10, 2015, the Bronx District Attorney's Office filed a Criminal Complaint against Plaintiff charging him with, inter alia, Assault in the Second Degree, Reckless Endangerment, Criminal Possession of a Weapon, and Directing a Laser at an Aircraft, as well as with violating certain regulations of the New York City Administrative Code governing the use of laser pointers. (Def. R. 56.1 Stmt. (Dkt. No. 36) ¶ 26; see also Criminal Complaint (Dkt. No. 34-8)) In the Criminal Complaint, the deponent (Detective Shawn Russell) states that he was informed by Officer Chittum that he "responded to a radio transmission for a laser beam emanating from a second floor window on Coddington Avenue"; that Chittum "arrived at the above location, and observed a spotlight from an [NYPD] Helicopter illuminating a second floor window"; and that he "observed the defendant inside the above location . . . , and further observed the defendant to have in his custody and control, on top of a refrigerator, which was near the window the police helicopter illuminated, one (1) laser pointer, which emitted a green light beam." (Criminal Complaint (Dkt. No. 34-8) at 3)

Plaintiff was arraigned on March 13, 2015. (Id. ¶ 27) At the arraignment, Plaintiff's sister's boyfriend, Elehecer Balaguer, appeared and told the court that he was the one who had been using the laser pointer on March 9, 2015. (Id.) Balaguer stated: "I'm coming in to discuss the matter that Frank Egan had nothing to do with this. I was the one that did it." (Anderson Decl., Ex. 6 (Arraignment Tr.) (Dkt. No. 40-6) at 4) The court asked Balaguer if he was "saying that you were the one that was involved in this involvement with the laser." Balaguer said "Yes." (Id.)

The charges against Plaintiff were dismissed on September 30, 2015, more than six months after his arrest. (Def. R. 56.1 Stmt. (Dkt. No. 36) ¶ 28; see also Siddiqui Decl. (Certificate of Disposition) (Dkt. No. 34-10)) Plaintiff was required to make four court

appearances in connection with this case: an arraignment on March 13, 2015, and status conferences on April 17, June 17, and October 15, 2015. (Pltf. Counterstmt. (Dkt. No. 39) ¶ 28; see also Siddiqui Decl., Ex. I (Court Record) (Dkt. No. 34-9))

## II.    PROCEDURAL HISTORY

The Complaint was filed on February 25, 2016, and alleges claims under Section 1983 for false arrest, malicious prosecution, and denial of fair trial rights against Officer Chittum, Sergeant Polanco, and the City of New York. (Cmplt. (Dkt. No. 1) ¶¶ 46-62)

Pending before the Court is Defendants' motion for summary judgment on all of Plaintiff's claims. [6]

### DISCUSSION

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of

---

[6] As noted above, although Plaintiff's claims against the City are not addressed in Defendants' motion, the City represents that Plaintiff's counsel has stated that Plaintiff will move for voluntary dismissal as to the City. (Def. Br. (Dkt. No. 35) at 10 n.1)

the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## B. Elements of a Section 1983 Claim

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right . . . secured by the Constitution or the laws of the United States." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citing 42 U.S.C. § 1983; Day v. Morgenthau, 909 F.2d 75, 77 (2d Cir. 1990)). "To state a claim under Section 1983, a plaintiff must show: '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; [and] (4) damages.'" Rahman v. Fisher, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes, 13 F.3d at 519 (citing City of Oklahoma

City v. Tuttle, 471 U.S. 808, 816 (1985)). "In order to prevail on a [S]ection 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right." Id. (citing Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986); Rand v. Perales, 737 F.2d 257, 260 (2d Cir. 1984)).

It is "well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." Vasquez v. Reilly, 15 Civ. 9528 (KMK), 2017 WL 946306, at *11 (S.D.N.Y. Mar. 9, 2017) (quoting Lindsey v. Butler, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014), reconsideration granted in part on other grounds, 2014 WL 5757448 (Nov. 5, 2014), reconsideration denied, 2015 WL 1501625 (Apr. 1, 2015)).

## II.    FALSE ARREST AND MALICIOUS PROSECUTION

### A.    Legal Standards

#### 1.    False Arrest

"'To state a claim for false arrest under New York law, a plaintiff must [allege] that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Corso v. City of New York, 17 Civ. 6096 (NRB), 2018 WL 4538899, at *6 (S.D.N.Y. Sept. 20, 2018) (quoting Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (internal quotation marks omitted)). "To avoid liability for a claim of false arrest,

12

an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

## 2. Malicious Prosecution

To prevail on a malicious prosecution claim under Section 1983, "a plaintiff must show a violation of his rights under the Fourth Amendment[] . . . and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (internal citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Id. (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)) (internal quotation marks and citation omitted).

As to initiation or continuation of a criminal proceeding, "'[i]n malicious prosecution cases against police officers, plaintiffs have met this first element . . . by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint.'" Cunninham v. New York City, 4 Civ. 10232 (LBS), 2007 WL 2743580, at *5 (S.D.N.Y. Sept. 18, 2007) (quoting Llerando-Phipps v. City of New York, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005)) (internal citations omitted). "Additionally, a defendant initiates a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'" Aguirre v. City of New York, 15 Civ. 6043 (PKC), 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017) (quoting Costello v. Milano, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)); see also Chimurenga v. City of New York, 45 F. Supp. 2d 337, 343 (S.D.N.Y.

1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution.").

### 3. Probable Cause

Probable cause to arrest is a complete defense to Plaintiff's claims for false arrest and malicious prosecution. See Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citations omitted)); Drummond v. Castro, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007) ("[T]he presence of probable cause is a complete defense to an action for malicious prosecution under § 1983 or state law.").

"'Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (quoting Williams v. Town of Greenburgh, 535 F.3d 71, 79 (2d Cir. 2008) (internal quotation marks and alterations omitted)). In assessing probable cause, "[t]he inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'" Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (quoting Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006)). Courts must also "look at the facts as the officers knew them in light of the specific elements of each crime." Id. "While an officer need not have concrete proof of each element of a crime to establish probable cause for an arrest, probable cause means more than bare suspicion." Id. (internal quotation marks and citations omitted).

14

"The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases. 'Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013) (quoting and citing Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003)). Further, "[w]here there is no change in the information known to police at the time of arrest and prosecution, probable cause sufficient to warrant arrest precludes a claim for malicious prosecution." Cortes v. City of New York, 148 F. Supp. 3d 248, 255 (E.D.N.Y. 2015).

### 4. Elements of the Charges Against Plaintiff

#### a. Assault in the Second Degree

A person is guilty of assault in the second degree when "[w]ith intent to prevent a . . . police officer . . . or employee of any entity governed by the public service law in the course of performing an essential service, from performing a lawful duty, . . . he or she causes physical injury to such [person.]" N.Y. Penal Law § 120.05(3).

#### b. Reckless Endangerment

"A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 120.25.

"A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." N.Y. Penal Law § 120.20.

### c. Criminal Possession of a Weapon

A person commits the crime of criminal possession of a weapon in the fourth degree when "[h]e possesses any . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2).

### d. Directing a Laser at an Aircraft in the Second Degree

"A person is guilty of directing a laser at an aircraft in the second degree when, with intent to disrupt safe air travel, he or she directs the beam of a laser . . . onto a specific aircraft intending to thereby disrupt or interfere with such aircraft in the special aircraft jurisdiction of the United States." N.Y. Penal Law § 240.76(1)

### e. Regulation of Laser Pointers

The New York City Administrative Code provides that "[i]t shall be unlawful . . . for any person to direct light emitted from a laser pointer into or through a public place." N.Y.C. Admin. Code § 10-134.2(d). The Code further provides that "[i]t shall be unlawful for any person to direct light from a laser pointer at a uniformed police officer . . . or other uniformed city, state or federal peace officer, investigator or emergency service worker, or the marked service vehicle of any such individual." Id. § 10-134.2(e).

### 5. Constructive Possession

As stated above, a person commits the crime of criminal possession of a weapon in the fourth degree when "[h]e possesses any . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2).

The New York Penal Law states that "possess" means "to have physical possession or otherwise to exercise dominion or control over tangible property." N.Y. Penal Law § 10.00(8). This provision has long "been construed as embracing constructive possession." Fernandez v. Breslin, 00 Civ. 7931 (LAK), 2001 WL 197034, at *2 (S.D.N.Y. Feb. 27, 2001).

16

"In New York, the rule has long been that to support a charge that a defendant was in constructive possession of tangible property, the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized." People v. Manini, 79 N.Y.2d 561, 573 (1992); see also United States v. Paulino, 445 F.3d 211, 222 (2d Cir. 2006) ("'Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" (quoting United States v. Gordils, 982 F.2d 64, 71 (2d Cir.1992) (emphasis in Paulino))).

Possession of certain weapons permits an inference of unlawful intent under New York law. For example, "[t]he possession by any person of any dagger, dirk, stiletto, dangerous knife or any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another." N.Y. Penal Law § 265.15(4). A laser pointer does not fall into any of these categories, because a laser pointer is not "designed, made or adopted for use primarily as a weapon." Accordingly, there is no presumption that the possession of a laser pointer demonstrates an intent to use it unlawfully.

## B. Whether Defendants Had Probable Cause to Arrest Plaintiff

Defendants argue that Plaintiff had constructive possession of the laser pointer, and that accordingly they had probable cause to arrest him. According to Defendants, "[t]he fact that the laser pointer was discovered in plain view[] invokes a lower standard for establishing constructive possession[,] in that[] constructive possession may be imputed to individuals apprehended in mere proximity to the contraband." (Def. Br. (Dkt. No. 35) at 20) Defendants further argue that "Officer Chittum and Sergeant Polanco were legitimately within the apartment

17

where plaintiff lives, with knowledge that a crime was ongoing. Upon entering the apartment, defendants discovered the laser pointer in plain view – thereby giving them probable cause to arrest any of the residents therein." (Id. at 21)

As Plaintiff notes, however, Defendants' argument and the cases they cite "concern the discovery of drugs or firearms ([i.e.,] contraband), the **mere possession** of which **is** an offense." (Pltf. Opp. (Dkt. No. 38) at 6 (emphasis in original)) Plaintiff further argues that Defendants' theory of probable cause is overbroad:

> The mere presence of a laser pointer in a premise, such as a school classroom or university lecture theatre (where they are commonly used) cannot create probable cause to arrest everyone in such a premise solely on the basis that the laser pointer may previously have been used to commit an offense. Following Defendants' logic, had there been a large event in the apartment at the time when Defendants arrived, such as a wake or a local community gathering, Defendants would have had probable cause to arrest every single person present. Such logic is flawed, because the law requires individualized probable cause to arrest. To allow otherwise in such scenarios, would be setting a dangerous precedent.

(Id. at 11)

"'The doctrine of constructive possession allows the police to find probable cause to arrest anyone in a dwelling when contraband is discovered in plain view and it reasonably appears that all members of the dwelling exercised dominion and control over the area in which the contraband is found.'" Jenkins v. City of New York, 10 Civ. 4535 (AJN), 2013 WL 870258, at *9 (S.D.N.Y. Mar. 6, 2013) (quoting Takacs v. City of New York, 9 Civ. 481 (LBS), 2011 WL 8771384, at *3 (S.D.N.Y. Jan. 24, 2011)) (citing Abreu v. Romero, 8 Civ. 10129 (LAP), 2010 WL 4615879, at *6 (S.D.N.Y. Nov. 9, 2010), aff'd, 466 F. App'x 24 (2d Cir. 2012)). The rationale behind this doctrine is that "those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense." United States v. Heath, 455 F.3d 52, 57 (2d Cir. 2006). This doctrine most commonly supplies

18

probable cause to arrest individuals for firearms and narcotics offenses – items whose criminality is immediately apparent. See id. (citing cases); Roberts v. City of New York, 16 Civ. 5409 (BMC), 2017 WL 4357291, at \*5 (E.D.N.Y. Sept. 29, 2017) ("Defendants had probable cause to arrest plaintiff . . . because they had reason to believe, based on the totality of the circumstances, that he had constructive possession of the firearm recovered at the apartment.").

Here, however, the possession of a laser pointer is not itself a crime, and the criminal purpose of a laser pointer is not immediately apparent. Criminal possession of a weapon in the fourth degree requires the possession of a "dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2) (emphasis added). As such, even if Plaintiff constructively possessed the laser pointer, that is not enough to provide probable cause in this case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to use it unlawfully. See Alhovsky v. Ryan, 658 F. Supp. 2d 526, 532 (S.D.N.Y. 2009) ("Probable cause must extend to every element of the crime for which a person is arrested. When an arrest is made, the police officer must have reasonably believed that each element of the criminal offense for which the arrest was made was committed."), aff'd sub nom. Alhovsky v. Paul, 406 F. App'x 535 (2d Cir. 2011) (summary order) ("Probable cause must extend to every element of the crime for which a person is arrested."); see also United States v. Levin, 15 Cr. 101 (KBF), 2015 WL 5602876, at \*2 (S.D.N.Y. Sept. 23, 2015) (noting that the Second Circuit in Alhovsky found that probable cause must extend to every element of a crime).

And, as discussed above, there is no presumption that possession or constructive possession of a laser pointer demonstrates an intent to use it unlawfully. In other words, absent

19

evidence that Plaintiff is the individual who pointed the laser pointer at aircraft on March 9, 2015, there was no probable cause to arrest Plaintiff.

Defendants have cited no case in which (1) the statutory presumption of unlawful intent was not applicable; (2) there was no evidence that the arrestee had used or intended to use the item at issue unlawfully; and (3) a court nevertheless found probable cause to arrest.[7] People v. Vaughn, 36 A.D.3d 434 (1st Dep't 2007) – cited by Defendants (Def. Br. (Dkt. No. 35) at 18) – is not to the contrary.

In Vaughn, defendant was convicted of assault in the second degree and criminal possession of a weapon in the third degree. "[T]here was credible evidence that one of the dangerous instruments used in the assault, a small bat, was actually handed to one of the assailants by defendant, just before defendant gave the order for the attack to begin." Id. at 435. The First Department ruled that the trial court properly instructed the jury on constructive possession of a criminal weapon, "in that defendant clearly exercised dominion and control over the persons who possessed the pipe and bat" that were used in the assault. Id.

Vaughn is not on point here, however, because (1) it does not address probable cause; (2) there was evidence directly linking the defendant to the assault charged in that case; and (3) the theory of constructive possession in that case – that a person may constructively

---

[7] New York courts have, of course, sustained convictions for criminal possession of a weapon based on constructive possession and the statutory presumption of intent. See People v. Grasso, 163 A.D.3d 991, 993 (2d Dep't 2018) ("The evidence established that the defendant exercised a sufficient level of dominion and control over the bedroom closet in his residence where the semiautomatic pistol was found to support the court's finding that he constructively possessed it. The evidence of the defendant's possession, coupled with the presumption embodied in Penal Law § 265.15(4), upon which the People relied at trial, was sufficient to establish the defendant's intent to use the weapon unlawfully against another." (internal citations omitted)).

possess an item through control over the person who possesses the item – is not at issue here. See id.

Here, all of the facts allegedly linking Plaintiff to use of the laser pointer are in dispute. For example, while Sergeant Polanco claims that Plaintiff told him that the laser pointer was his (Polanco Dep. (Dkt. No. 40-1) at 21), Plaintiff disputes this assertion (Egan Dep. (Dkt. No. 34-6) at 56), and Officer Chittum maintains that Balaguer said that the laser pointer was his, and that he purchased it in Florida. (Chittum Dep. (Dkt. No. 34-5) at 12-13) There is also contradictory evidence in the record concerning the window identified by the Aviation Unit officers as the source of the laser beam. Sergeant Polanco testified that the Aviation Unit officers identified a window in the kitchen (Polanco Dep. (Dkt. No. 40-1) at 19-20), while Officer Chittum testified that the Aviation Unit officers identified a window in Plaintiff's bedroom. (Chittum Dep. (Dkt. No. 34-5) at 17-18) Moreover, while both Officer Chittum and Sergeant Polanco testified that the Aviation Unit officers identified Plaintiff as the person who had been using the laser pointer (id. at 13-14; Polanco Dep. (Dkt. No. 40-1) at 21), Detective Mardarello – the pilot of the NYPD helicopter – stated that he did not remember having any communication with the officers on the ground (Mardarello Dep. (Dkt. No. 34-1) at 16), and Officer Charles stated that he could not see inside the window where the laser beam was coming from and could not see the individual whom the precinct officers had taken into custody. According to Charles, the officers on the ground simply stated that "they have one under arrest and that's it." (Charles Dep. (Dkt. No. 34-2) at 10-11)

Absent evidence that Plaintiff – as opposed to Balaguer or another occupant of the apartment – was the person who had been using the laser pointer, there was no probable cause to

21

arrest Plaintiff. Determinations of probable cause must, of course, be made on an individualized basis, and cannot be made en masse.

Ybarra v. Illinois, 444 U.S. 85 (1979), is instructive on this point. In that case, a law enforcement officer received information from a reliable informant that the bartender of a tavern was selling heroin, and he obtained a search warrant for the tavern and the person of the bartender. Id. at 87-88. Officers went to the tavern to execute the warrant, and began by announcing that they were "going to conduct a 'cursory search for weapons.'" Id. at 88. One of the officers then conducted a patdown search of each of the nine to thirteen customers in the tavern. In patting down plaintiff, the officer felt what he described as a "cigarette pack with objects in it." The officer moved on to search other patrons, but returned to plaintiff and frisked him again. The officer "retrieved the cigarette pack from [plaintiff's] pants pocket," and "[i]nside the pack he found six tinfoil packets containing a brown powdery substance which later turned out to be heroin." Id. at 89. Plaintiff was indicted for possession of a controlled substance, and moved to suppress the heroin.

The Supreme Court ruled that there was no probable cause to search plaintiff:

Upon entering the tavern, the police did not recognize [plaintiff] and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. [Plaintiff] made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about [plaintiff], except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

Id. at 90-91.

While the "police possessed a warrant based on probable cause to search the tavern in which [plaintiff] happened to be at the time the warrant was executed,"

a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

Id. (citations omitted).

Similarly here, while the officers had strong reason to believe that criminal activity was occurring in the apartment, there are no undisputed facts connecting Plaintiff to that criminal activity. In the absence of an "individualized" determination of probable cause premised on undisputed facts, summary judgment is improper. See Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("[T]he belief of guilt must be particularized with respect to the person to be searched or seized . . . ."); Dallas v. Goldberg, 95 Civ. 9076 (DLC), 1997 WL 728153, at *6 (S.D.N.Y. Nov. 20, 1997) ("An arrest requires not only probable cause to believe that a crime had been committed, but also probable cause to believe that it has been committed by the person arrested.").

United States v. Jones, 72 F.3d 1324 (7th Cir. 1995), cited by Defendants (Def. Br. (Dkt. No. 35) at 18), is instructive on this point. In Jones, a husband and wife – Otto and Ann Jones – were charged with manufacturing counterfeit currency. An informant had told agents that a house located at 5440 South Paulina in Chicago was a source of counterfeit currency. Id. at 1326 n.2. The informant had twice purchased counterfeit money from a suspect named Duncan, and on each occasion, agents had observed Duncan at the South Paulina street residence shortly before the informant returned with counterfeit currency obtained from Duncan. The agents had observed Duncan approach the residence; saw Ann Jones answer the door; and observed saw Duncan take currency from her purse and hand it to Mrs. Jones. Mrs. Jones closed

the door, and minutes later Duncan approached a window at the front of the house, and then

walked toward the alley, counting something in her hands. Id. at 1326. That same day, agents

observed four more individuals approach the house and leave with currency. See id. Later that

day, agents executed a search warrant at the house.

> Mrs. Jones answered the door

> and admitted the officers to the home. Mr. Jones was standing just inside the
> doorway, dressed in pajamas and a bathrobe. As the officers entered, Mrs. Jones
> dropped an apparently genuine $20 bill as she attempted to stuff papers into her
> pants. When she was searched, agents discovered an envelope in the waistband of
> her pants containing some $6,000 worth of counterfeit bills in denominations of
> $100, $50, and $20. Ultimately, Mr. Jones was searched as well. Genuine
> currency in the amount of $299 was discovered in the pocket of his bathrobe.

Id. at 1326-27 (internal citation omitted).

The husband moved to suppress the $299 found in his bathrobe. The Government

did not contend that it had probable cause to search the husband at the time of the search.

Instead, the Government argued that under the inevitable discovery doctrine, "the authorities

would ultimately have had probable cause for the arrest and search before leaving the premises

of the . . . household, rendering discovery of the $299 in his pocket inevitable." Id. at 1330.

> The Seventh Circuit noted that

> [u]pon entering the house, the agents witnessed Ann Jones attempting to stuff into
> her pants what on inspection turned out to be an envelope containing thousands of
> dollars in counterfeit bills. Mr. Jones, notably, was in her immediate presence as
> she was doing so. The officers subsequently discovered the equipment used to
> produce the bills scattered throughout the house – the copier, colored pencils, and
> briefcase with blank paper in the bedroom; the mock-ups of original bills
> underneath the mattress; the stamper in the rear stairwell; additional blank paper
> in the kitchen. Counterfeit currency was also discovered in the rear stairwell and
> on top of the television in the basement. Much of this contraband was in plain
> view. Indeed, the fact that several of the items were found in the master bedroom
> that Mr. and Mrs. Jones presumably shared only increases the likelihood that Mr.
> Jones was aware of, and had access to, the counterfeiting materials.

Id. at 1332.

Based on this evidence, the Seventh Circuit concluded – in a 2 to 1 decision – that it was not clear error

> for the district court to conclude that the officers would have had probable cause to arrest Mr. Jones before they left the premises irrespective of the money found in the pocket of his bathrobe. It is undisputed that Mr. Jones lived on the premises, as his state of attire at the time of the arrest tends to confirm. Indeed, given that he had not been observed either leaving or returning to the premises in the course of the surveillance, so far as the officers knew he had been on the premises throughout the day. And during that time, numerous people had visited the house with the apparent purpose of obtaining counterfeit money, in a number of cases ringing the doorbell to announce their arrival and in some instances being admitted inside the house. Given the fairly extensive amount of trafficking in counterfeit money Ann Jones had apparently conducted on the premises on that day alone, the evidence of counterfeiting scattered throughout the basement and first floor of the home, the officers conducting the search reasonably could have concluded that Mr. Jones, as a resident of the premises (indeed, one who was present while Mrs. Jones attempted to hide counterfeit bills on her person) was not only aware of the counterfeiting activity, but played some part in it.

Id.

> Even in reaching this holding, however, the Seventh Circuit emphasized that

> the illegal acts of one individual cannot automatically be attributed to her spouse as well; ultimately, the government must make an independent case for the spouse's culpability. Mr. Jones' "mere propinquity" to Mrs. Jones and the site of her trafficking of counterfeit did not supply the authorities with probable cause to arrest him. And, until the fingerprint analysis was completed some time after the search, the officers had little information tying Mr. Jones directly to the counterfeiting activity. Nonetheless, we cannot say that no reasonable person could accept the district court's conclusion that the officers' on-the-spot assessment of Mr. Jones' likely involvement lay within the "zone" of probable cause. Given Mr. Jones' evident status as a resident of a private household in which counterfeit money was being sold on regular basis and in which the evidence of counterfeiting lay in plain view, one could fairly conclude that the arresting agents had probable cause particularized as to Mr. Jones himself.

Id. at 1332-33 (citations omitted).

Jones does not support Defendants' argument that there are no material issues of fact here as to whether there was probable cause to arrest Plaintiff. As the Seventh Circuit stated, "Mr. Jones' 'mere propinquity' to Mrs. Jones and the site of her trafficking of counterfeit

did not supply the authorities with probable cause to arrest him." Id. at 1332. In finding that there was probable cause to arrest Mr. Jones, the Seventh Circuit cited "the fairly extensive amount of trafficking in counterfeit money Ann Jones had apparently conducted on the premises on that day alone [and] the evidence of counterfeiting scattered throughout the basement and first floor of the home," and concluded that "the officers conducting the search reasonably could have concluded that Mr. Jones, as a resident of the premises (indeed, one who was present while Mrs. Jones attempted to hide counterfeit bills on her person) was not only aware of the counterfeiting activity, but played some part in it." Id. In other words, given (1) that "evidence of counterfeiting [was] scattered throughout . . . the home"; (2) that numerous sales of counterfeit currency took place at the home during the single day of surveillance conducted by the agents; and (3) given that Mr. Jones lived in the home and was present that day, it was reasonable to conclude that Mr. Jones "was not only aware of the counterfeiting activity, but played some part in it." Id.

Applying these principles here, although the officers had reason to believe that a laser pointer had been unlawfully used in the apartment that Plaintiff resided in, this fact alone did not give Defendants probable cause to arrest Plaintiff absent evidence that he had operated the laser pointer. "[I]t is settled that '[m]ere . . . presence at the scene of a crime does not create probable cause,'" United States v. Gutierrez-Flores, 94 Cr. 393 (CSH), 1994 WL 537569, at *3 (S.D.N.Y. Oct. 3, 1994) (quoting United States v. Almanzar, 749 F. Supp. 538, 540 (S.D.N.Y. 1990)), and that is what the evidence against Plaintiff amounts to. And, unlike in Jones, where the defendant lived in a residence that was awash with all the tools of the counterfeiting trade, and where sales of counterfeit currency were commonplace – thus making the criminal activity "obvious" – the small, pen-sized laser pointer (see Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 32)

26

found in Plaintiff's residence does not constitute obvious evidence of criminal activity, and its criminal purpose is not immediately apparent.

In sum, Defendants' argument that "[t]he officers had a valid ground for arresting all of the occupants of 2801 Coddington Avenue, based on the principles of constructive possession, including plaintiff" is misplaced. (Def. Br. (Dkt. No. 35) at 22) Although the officers had strong reason to believe that criminal activity had taken place at the apartment, they did not have strong reason to believe that Plaintiff was involved in that criminal activity. See Ybarra, 444 U.S. at 91 ("This requirement [of individualized probable cause] cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause . . . to search the premises where the person may happen to be."). Accordingly, material issues of fact exist as to whether Defendants had probable cause to arrest Plaintiff, and they are not entitled to summary judgment on Plaintiff's false arrest claim.

## C. Whether Defendants Maliciously Prosecuted Plaintiff

### 1. Whether Defendants Initiated or Commenced a Criminal Proceeding

#### a. Officer Chittum

Defendants argue that the malicious prosecution claim against Chittum fails because "[t]he completion of NYPD arrest and complaint reports does not 'initiate' a prosecution." (Def. Reply (Dkt. No. 41) at 9)

Plaintiff argues, however, that "Chittum was the arresting officer for Plaintiff and he completed and entered the NYPD Omniform System Arrest Report. . . . In addition, . . . Chittum entered the NYPD Omniform System Complaint . . . and signed a sworn Supporting Deposition for the Criminal Court Complaint. . . . Accordingly, . . . Chittum is deemed to have initiated the criminal proceedings against Plaintiff." (Pltf. Opp. (Dkt. No. 38) at 13)

27

"'In malicious prosecution cases against police officers, plaintiffs have met this first element [of initiation of prosecution] by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint.'" Cunninham v. New York City, 4 Civ. 10232 (LBS), 2007 WL 2743580, at *5 (S.D.N.Y. Sept. 18, 2007) (quoting Llerando-Phipps v. City of New York, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005)) (internal citations omitted).

Here, Officer Chittum swore to a Supporting Deposition in connection with the Criminal Complaint, representing that he had "read the complaint . . . and that the facts stated in that complaint . . . furnished by [Officer Chittum] are true upon [his] personal knowledge." (Supporting Deposition (Dkt. No. 40-4)) This Supporting Deposition satisfies the "initiation of prosecution" element of a malicious prosecution claim under New York law. See Davis v. City of New York, 373 F. Supp. 2d 322, 334 (S.D.N.Y. 2005) (police officer signing supporting deposition sufficient to satisfy the initiation or commencement element); Carter v. Port Auth. of N.Y. & N.J., 3 Civ. 8751 (DLC), 2004 WL 2978282, at *2, 8 (S.D.N.Y. Dec. 20, 2004) ("Iadevaio signed the criminal court complaint against Carter, and Vogric signed the corroborating affidavit to the criminal court complaint." Id. at *2. "Here, it is clear that the defendants Iadevaio and Vogric initiated and continued criminal process against Carter by swearing out the complaining and corroborating affidavits to initiate the case and being available as witnesses to continue the case." Id. at *8.)

Accordingly, Officer Chittum is not entitled to summary judgment on Plaintiff's malicious prosecution claim.

### b.    Sergeant Polanco

Defendants argue that "[a]t most, Sergeant Polanco's role in plaintiff's prosecution was a routine report of plaintiff's crime to the District Attorney's Office." (Def. Br.

(Dkt. No. 35) at 25)  Plaintiff responds that "Sgt. Polanco provided false information to the prosecutor when he falsely alleged that Mr. Egan, when shown the laser in question by Sgt. Polanco at the time of the arrest, stated 'that's mine.'" (Pltf. Opp. (Dkt. No. 38) at 13)

As discussed above, Sergeant Polanco testified that he provided details concerning "[t]he specific[s] of the crime" to the Bronx District Attorney's Office "a week after the event." (Polanco Dep. (Dkt. No. 40-1) at 25)  It is undisputed that, among "[t]he specifics of the crime" Polanco reported to the District Attorney's Office, was Polanco's claim that Plaintiff said "that's mine" in reference to the laser pointer. (Def. R. 56.1 Reply (Dkt. No. 42) ¶ 12; see also Def. Reply (Dkt. No. 41) at 11 (arguing that "plaintiff cannot demonstrate that Sgt. Polanco 'commenced or continued' criminal proceedings against plaintiff by telling the prosecutor that plaintiff said 'that's mine' regarding the laser pointer"))  As also noted above, Sergeant Polanco's assertion that Plaintiff told him that the laser pointer was his appears in a Notice of Statement produced by the District Attorney's Office during discovery in the criminal case against Plaintiff (Notice of Statement (Dkt. No. 40-5) at 1-2), and in a "District Attorney Complaint Report Form" (Siddiqi Decl., Ex. C (Dkt. No. 34-3) at 2).

A police officer can initiate a prosecution "'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'" Ying Li v. City of New York, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (quoting Costello v. Milano, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)); see also Llerando-Phipps v. City of New York, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005) ("[A]n arresting officer may be held liable for malicious prosecution 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.'" (quoting Brome v. City of New York, 2 Civ. 7184 (WHP), 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004))).

Here, Plaintiff testified that – contrary to the information Sergeant Polanco provided to the District Attorney's Office – he never told officers that the laser pointer was his. (Egan Dep. (Dkt. No. 34-6) at 56; Notice of Statement (Dkt. No. 40-5) at 1-2) Accordingly, there is an issue of fact as to whether Plaintiff told Sergeant Polanco that the laser point was his.

The court further concludes that there is an issue of fact as to whether Polanco's account of Plaintiff's admission of ownership of the laser pointer is material. A reasonable jury could find that Plaintiff's alleged admission of ownership is probative as to whether Plaintiff was the person who used the laser pointer. Accordingly, the materiality of the challenged admission is a question that must be resolved by a jury. See Rodriguez v. City of New York, 291 F. Supp. 3d 396, 417 (S.D.N.Y. 2018) ("[A] jury must decide . . . whether any such statements were likely to influence a criminal grand or petit jury if put before one . . . ."); see also Richardson v. City of New York, 2 Civ. 3651 (JG), 2006 WL 2792768, at *7 n.4 (E.D.N.Y. Sept. 27, 2006) ("In order for a plaintiff to recover [on a malicious prosecution claim based on fabricated evidence], the alleged fabrication must be . . . material, i.e., 'likely to influence a jury's decision[]' . . . ." (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997))).

Defendants point out that Plaintiff's alleged admission concerning ownership of the laser pointer is not mentioned in the criminal complaint. (Def. Br. (Dkt. No. 35) at 30) There is undisputed evidence, however, that Sergeant Polanco provided information concerning this alleged admission to the District Attorney's Office, and that is sufficient to sustain a malicious prosecution claim where a reasonable jury could conclude that the challenged "statement[] [would be] likely to influence a criminal grand or petit jury if [the statement were] put before one." Rodriguez, 291 F. Supp. 3d at 417.

Given that this Court has determined that there is an issue of material fact as to whether the officers had probable cause to arrest Plaintiff, Sergeant Polanco cannot rely on the principle that false information forwarded to prosecutors will not "initiate" a prosecution where there was probable cause absent the allegedly false statement. See Hoyos v. City of New York, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) ("[E]ven where plaintiff alleges, as here, that the malicious prosecution is based on fabricated evidence, 'the existence of probable cause independent of the [falsified] evidence is a defense to that claim.'" (quoting Morse v. Spitzer, 7 Civ. 4793 (CBA), 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012)).[8]

The Court concludes that Sergeant Polanco is not entitled to summary judgment on Plaintiff's malicious prosecution claim.

## III.    DENIAL OF FAIR TRIAL

### A.    Legal Standards

"To prevail on a denial of fair trial claim, a plaintiff must show that 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.'" Soomro v. City of New York, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)). For a denial of a fair trial claim to proceed, there need not be a trial; rather, "the claim can accrue when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." Id. (citing Ricciuti, 124 F.3d at 130). Moreover, "[t]he deprivation need not be in the form of

---

[8] Defendants argue that Plaintiff has not demonstrated actual malice, but "[o]nce [a court] find[s] an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well. A lack of probable cause generally creates an inference of malice." Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003) (citing Ricciuti, 124 F.3d at 131).

post-trial confinement." Id. (citing Ricciuti, 124 F.3d at 130; Jean-Laurent v. Bowman, 12 Civ. 2954 (KAM), 2014 WL 4662232, at \*3 n.1 (E.D.N.Y. Sept. 18, 2014)).

The Second Circuit has "consistently held that a post-arraignment defendant who is 'obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required' suffers a Fourth Amendment deprivation of liberty." Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) (quoting Murphy v. Lynn, 118 F.3d 938, 946 (2d Cir. 1997)).

## B. Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Denial of Fair Trial Claim

### 1. Sergeant Polanco

Plaintiff's denial of fair trial claim is based on Sergeant Polanco's statement to the District Attorney's Office that Plaintiff told Polanco that the laser pointer was his. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 38; Notice of Statement (Dkt. No. 40-5) at 1-2 (in response to a "pre-arrest, pre-Miranda . . . investigative question," Plaintiff responded "that's mine"); Def. Reply (Dkt. No. 41) at 11 (arguing that "plaintiff cannot demonstrate that Sgt. Polanco 'commenced or continued' criminal proceedings against plaintiff by telling the prosecutor that plaintiff said 'that's mine' regarding the laser pointer")) Defendant Polanco argues that his account of Plaintiff's alleged admission would be unlikely to influence a jury's decision (see Def. Br. (Dkt. No. 35) at 28-30); that "the information forwarded to the prosecutor to generate the relevant charging documents stem[s] from undisputed facts" (id. at 29); that the "prosecutor included the complaints of the commercial airline pilots and Detective Mardarello pertaining to their temporary blindness from being exposed to the laser" in the criminal complaint (id. at 30); and that "the criminal court complaint cites Officer Chittum's observation pertaining to the location and recovery of the laser pointer within the apartment." (Id.)

Defendant Polanco further argues that his

32

statement regarding plaintiff's confession is not contained in the criminal court complaint. The omission of this statement from the criminal court complaint, in and of itself, is dispositive as to the lack of materiality of that statement. The District Attorney's Office chose to omit this information from the criminal court complaint because it was not material to the probable cause determination and basis for prosecution; the complaints of the airline pilots and Officer Chittum's description of plaintiff's proximity to the laser pointer were sufficient. Therefore, the statement "that's mine" was not included to the criminal court complaint, and as such could not have been used to have been used to influence a jury's decision. Hence, plaintiff has failed to make out a fabrication claim because the allegedly fabricated statement did not form any basis of the prosecution against him.

(Id.)

Plaintiff argues, however, that the "statement at issue is tantamount to a false confession and would unquestionably influence a jury in making a decision on the charges brought against Plaintiff." (Pltf. Opp. (Dkt. No. 38) at 17-18) Plaintiff further contends that Defendant Polanco's argument that the "relevant charging documents stem from undisputed facts" is irrelevant, as "it has no bearing on the fact that the false statement forwarded to prosecutors by Sgt. Polanco would likely influence a jury's decision." (Id. at 18-19) Plaintiff also claims that the facts Defendant Polanco maintains are "undisputed" are actually in dispute. (Id. at 19-22)

"The manufacture of false evidence, 'in and of itself[]' . . . , does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." Zahrey v. Coffey, 221 F.3d 342, 348 (2d Cir. 2000). Accordingly, "a fair trial claim based on allegations that the police fabricated evidence requires that the plaintiff 'suffer[ ] a deprivation of liberty as a result' of the alleged fabrication." Hoyos v. City of New York, 999 F. Supp. 2d 375, 393 (E.D.N.Y. 2013) (quoting Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)) (emphasis in Hoyos).

A denial of fair trial claim may be premised on "falsified information [in an] officer's account, conveyed to prosecutors, of what he heard the defendant say or do during the alleged offense." Garnett v. Undercover Officer C0039, 838 F.3d 265, 275 (2d Cir. 2016). "Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case." Haskins v. City of New York, 15 Civ. 2016 (MKB), 2017 WL 3669612, at *11 (E.D.N.Y. Aug. 24, 2017) (citing Garnett, 838 F.3d at 277 ("The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence.")).

As discussed above, the materiality of Plaintiff's alleged admission presents an issue of fact. The Court further finds that whether the allegedly fabricated evidence caused Plaintiff to suffer a deprivation of liberty likewise presents an issue of fact.

The Court acknowledges at the outset that the criminal complaint does not contain Sergeant Polanco's allegedly false statement concerning Plaintiff's admission. (Criminal Complaint (Dkt. No. 34-8)) Accordingly, the criminal complaint provides no basis for a denial of fair trial claim. See Torres v. City of New York, 16 Civ. 6719 (BMC), 2017 U.S. Dist. LEXIS 158883, at *15-16 (E.D.N.Y. Sept. 27, 2017) (where officer's fabricated statement about witnessing an assault was not included in criminal complaint, district court dismissed denial of fair trial claim: "[T]here is nothing in the criminal complaint that supports even an inference that [the defendant's] purported observation of the assault factored into the [Kings County District Attorney's Office's] decision to bring charges against plaintiffs. There is no mention whatsoever

that [the defendant] had first-hand knowledge; rather, all of the information is from the complaining witness, referred to as the 'informant.'").

It is undisputed, however, that Sergeant Polanco told the District Attorney's Office that Plaintiff had admitted that the laser pointer was his. (Def. R. 56.1 Reply (Dkt. No. 42) ¶ 12; Def. Reply (Dkt. No. 41) at 11 (arguing that "plaintiff cannot demonstrate that Sgt. Polanco 'commenced or continued' criminal proceedings against plaintiff by telling the prosecutor that plaintiff said 'that's mine' regarding the laser pointer")) Accordingly, the issue this Court must resolve is whether a reasonable jury could find that the alleged false statement Sergeant Polanco made to the District Attorney's Office could have led Plaintiff to have suffered a deprivation of liberty.

As discussed above, at Plaintiff's arraignment his sister's boyfriend – Elehecer Balaguer, another occupant of the apartment – told the court that he – and not Plaintiff – had been using the laser pointer. (Def. R. 56.1 Stmt. (Dkt. No. 36) ¶ 27; Arraignment Tr. (Dkt. No. 40-6) at 4) Despite Balaguer's confession, the charges against Plaintiff were not dismissed until September 30, 2015, more than six months after Plaintiff's arrest. (Id. ¶ 28; Certificate of Disposition (Dkt. No. 34-10)) Based on these facts, a reasonable juror could find that Sergeant Polanco's statement about Plaintiff's admission of ownership – the only substantial evidence linking Plaintiff to the laser pointer – delayed the District Attorney's dismissal of the charges against Plaintiff, requiring Plaintiff to appear for several court appearances between March and October 2015.

While Plaintiff was released on his own recognizance at arraignment, he was required to attend court conferences on April 17, June 17, and October 15, 2015. (Court Record (Dkt. No. 34-9) at 1; Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 28) As such, he suffered a post-

35

arraignment deprivation of liberty. See Swartz, 704 F.3d at 109, 112 (where plaintiff was required to make three court appearances in connection with a disorderly conduct charge, he had suffered a deprivation of liberty sufficient to maintain a malicious prosecution claim); Price v. City of New York, 15 Civ. 5871 (KPF), 2018 WL 3117507, at *8 (S.D.N.Y. June 25, 2018) ("Courts have found a liberty deprivation, for example, where arrestees were arraigned and were subsequently required to make one other court appearance." (citing cases)).

The Court concludes that there is a genuine issue of material fact as to whether Sergeant Polanco's statement to the District Attorney's Office about Plaintiff's alleged admission of ownership caused Plaintiff to suffer a deprivation of liberty.

Ashley v. City of New York, 14 Civ. 5559 (NGG), 2017 WL 2972145 (E.D.N.Y. July 12, 2017), is instructive on this point. In Ashley, plaintiff was twice previously arrested at a certain apartment and charged with criminal possession of marijuana. A police officer later executed a search warrant at that apartment. Plaintiff was not at the apartment at that time. The officer found eighteen small plastic bags of marijuana in the living room along with several of Plaintiff's possessions. A criminal complaint signed by the officer falsely stated that Plaintiff was present when the marijuana was discovered. A superseding complaint signed by the same officer corrected the error, but reported that Plaintiff returned after the search and said, "this is what happens when you let strange people into our apartment." Plaintiff denied making this statement. Id. at *1-2.

The district court denied defendants' summary judgment motion on plaintiff's denial of fair trial claim:

> The court determines that there is a genuine dispute as to key facts such that a jury could reasonably decide either way on the question of causation. Summary judgment is therefore inappropriate. . . .

Defendants assert that the DA would have prosecuted Plaintiff's case absent the false statement in the Original Complaint. They argue that the fact that the DA continued to prosecute Plaintiff after the first false statement was discovered proves this point. Defendants' argument ignores the possibility that the DA may have dropped the charges against Plaintiff without the second allegedly false statement. As such, a reasonable jury could find first, that the second statement was false and second, that without the false statements, the charges against Plaintiff would have been dropped by the DA and/or dismissed by the state court because there was insufficient evidence of Plaintiff's dominion and control over the marijuana.

Id. at *9 (citations omitted).

Similarly here, a reasonable jury could find that the case against Plaintiff was pursued for more than six months – after Balaguer had exonerated Plaintiff – because of Sergeant Polanco's statement that Plaintiff had admitted that the laser pointer was his. Accordingly, Sergeant Polanco is not entitled to summary judgment on Plaintiff's denial of fair trial claim. See Collins v. City of New York, 295 F. Supp. 3d 350, 372 (S.D.N.Y. 2018) (where Plaintiff claimed that police officer lied when he testified he saw Plaintiff in a group blocking traffic, district court denied summary judgment on denial of fair trial claim: "it was the only piece of evidence supporting a charge for disorderly conduct," and "the eyewitness testimony of a police officer is information particularly likely to be believed by a jury. As a result, a reasonable jury could conclude that [defendant's] statements caused [p]laintiff . . . to suffer a restriction of liberty in the form of waiting three hours to be released on her own recognizance followed by nine follow-up court appearances." (citations omitted)); Rodriguez, 291 F. Supp. 3d at 417 ("[A] jury must decide whether any statements communicated to the [District Attorney's Office] were fabricated; whether any such statements were likely to influence a criminal grand or petit jury if put before one; and whether such statements caused the deprivation of Plaintiff's liberty.").

### 2.  **Officer Chittum**

Although the Complaint alleges a denial of fair trial claim against Officer Chittum (see Cmplt. (Dkt. No. 1) ¶¶ 58-62), Plaintiff's Opposition argues only that Sergeant Polanco fabricated evidence that was presented to the District Attorney. (Pltf. Opp. (Dkt. No. 38) at 17; Pltf. R. 56.1 Counterstmt. (Dkt. No. 39) ¶ 38)  Because Plaintiff has not argued that Officer Chittum fabricated evidence, and has not proffered facts demonstrating that Officer Chittum fabricated evidence that was provided to prosecutors and that caused a deprivation of liberty, Officer Chittum is entitled to summary judgment on Plaintiff's denial of fair trial claim. See Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (ruling that where plaintiff "made no attempt to rebut defendants' motion for summary judgment," plaintiff had abandoned the claim); id. at 208 n.108 (collecting cases).

## IV.  **QUALIFIED IMMUNITY**

Where (1) an officer's conduct "did not violate a clearly established constitutional right," or (2) "it was objectively reasonable for the officer to believe his conduct did not violate such a right," then the officer is entitled to qualified immunity and to summary judgment on a plaintiff's Section 1983 claims. Gilles v. Repicky, 511 F.3d 239, 244 (2d Cir. 2007).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

"Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737,

743 (2d Cir. 2004). Arguable probable cause to arrest exists if either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks and citations omitted). "[A]n 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" McClellan v. Smith, 439 F.3d 137, 147-48 (2d Cir. 2006) (citations omitted)). "'Because qualified immunity is an affirmative defense, defendants bear the burden of showing that there was arguable probable cause.'" Nunez v. City of New York, 14 Civ. 4182 (RJS), 2016 WL 1322448, at *5 (S.D.N.Y. Mar. 31, 2016) (quoting Gaston v. City of New York, 851 F. Supp. 2d 780, 795 (S.D.N.Y. 2012)). At the summary judgment stage, "a police officer who makes a warrantless arrest is entitled to summary judgment on the ground of qualified immunity only 'if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions.'" Rogers v. City of Amsterdam, 303 F.3d 155, 158 (2d Cir. 2002) (quoting Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001) (internal quotation omitted)).

The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Rather, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established,'" id. (quoting al-Kidd, 563 U.S. at 742) (emphasis in Mullenix), and "[t]his inquiry 'must be undertaken in light of the

specific context of the case, not as a broad general proposition.'" Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

Because of the material issues of fact discussed above, this Court cannot grant Defendants summary judgment on Plaintiff's false arrest and malicious prosecution claims on grounds of qualified immunity.[9] Indeed, were this Court to consider only the undisputed facts in the record, it would conclude that Defendants had no reason to suspect that Plaintiff – as opposed to Balaguer or another occupant of the apartment – had used the laser pointer.

The principle that an officer must have individualized probable cause to arrest a Plaintiff is well established. See, e.g., Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("[T]he belief of guilt must be particularized with respect to the person to be searched or seized. . . ."); Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (the requirement of individualized probable cause "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be"); Jones v. Parmley, 465 F.3d 46, 59-60 (2d Cir. 2006) (where officers conceded they could not identify any individual person on the road blocking traffic, "Defendants could not, then, have reasonably thought that indiscriminate mass arrests without probable cause were lawful under these circumstances," id. at 60); Dinler v. City of New York, 4 Civ. 7921 (RJS), 2012 WL 4513352 (S.D.N.Y. Sept. 30, 2012) ("[N]o matter the circumstances, an arresting officer must believe that every individual arrested personally violated the law.").

Here, even assuming arguendo that the officers were confident that someone in the apartment had been shining a laser pointer at aircraft, the law is well established that they

---

[9] Defendants do not argue that qualified immunity applies to Plaintiff's denial of fair trial claim, nor do they argue that it applies to Plaintiff's malicious prosecution claim against Polanco based on the allegedly false information he provided to prosecutors.

could not arrest an occupant of that apartment absent reason to believe that that person had used the device. "On this record, [this court] cannot say that a jury would have to conclude that officers of reasonable competence would disagree on whether the probable cause test was met," Rogers v. City of Amsterdam, 303 F.3d 155, 160 (2d Cir. 2002), as the undisputed facts do not provide an individualized basis to believe that Plaintiff had violated the law.[10]

Moreover, Defendants have not argued, and the evidence does not demonstrate, that Defendants made a reasonable "mistake in law." If the officers had concluded that the laser pointer was a "weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon," such a determination could have supplied at least arguable probable cause to arrest Plaintiff, as possession of such devices is "presumptive evidence of intent to use the same unlawfully against another." N.Y. Penal Law § 265.15(4). It would not have been reasonable for Defendants to have believed that a laser pointer is used primarily as a weapon, however. See Matter of Jamie D., 59 N.Y.2d 589, 592 (1983) (defining weapon as "'as instrument of offensive or defensive combat'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2589)); id. at 593 ("In Ricci S. while the police were conducting a search of an apartment which they had had under surveillance in connection with suspected activity in narcotics, the defendant came on the scene. When he was being searched for possession of

---

[10] Defendants argue that "plaintiff cannot dispute that the officers reasonably feared for their safety in the face of [the] perceived threat." (Def. Br. (Dkt. No. 35) at 34) But Defendants do not explain why a reasonable officer would have been in fear once the laser pointer was seized.

Defendants further contend that "[P]laintiff . . . cannot dispute that the officers confirmed with the aviation unit that he was the person shining the laser pointer." (Id.) As noted above, however, Officer Charles stated that he could not see inside the windows, that he couldn't see who the officers brought outside, and that the precinct officers simply announced that they "have one under arrest and that's it." (Charles Dep. (Dkt. No. 34-2) at 10-11) And Detective Mardarello testified that he could not remember having any communication with the police officers on the ground. (Mardarello Dep. (Dkt. No. 34-1) at 16)

narcotics, the police discovered a hunting knife on his person. There was nothing in the characteristics of the knife or in the circumstances of its possession to suggest that it was other than what it appeared to be – a utilitarian hunting knife and not a weapon."); People v. Rivera, 182 Misc. 2d 244, 246 (New York Cty. Crim. Ct. 1999) ("[A] knife designed primarily for use as a utilitarian utensil is not deemed a weapon, absent physical modification. Thus, the presumption of unlawful intent under Penal Law § 265.15(4) has been held inapplicable to a razor, and to a straight blade knife with a handle. The complaint fails to allege any facts which would lead to the inference that the knife which is the subject of the weapon possession charge is intended for use primarily as a weapon." (citations and footnote omitted)).

In sum, because of the many issues of material fact, Defendants' motion for summary judgment on the basis of qualified immunity will be denied.

## CONCLUSION

For the reasons stated above, in its September 30, 2018 Order, this Court denied (1) Defendant Polanco's motion for summary judgment; and (2) Defendant Chittum's motion for summary judgment on Plaintiff's false arrest and malicious prosecution claims. (Sept. 30, 2018 Order (Dkt. No. 44)) Defendant Chittum's motion was granted as to Plaintiff's denial of fair trial claim, however. (Id.)

Plaintiff's counsel is directed to submit a letter by October 17, 2018, stating whether Plaintiff will voluntarily dismiss as to the City of New York.

The parties will make their pretrial filings in accordance with the schedule set forth in the September 30, 2018 Order and, as stated in that Order, trial will commence at **9:30**

**a.m. on January 28, 2019**, in Courtroom 705, United States Courthouse, 40 Foley Square, New

York, New York.

Dated: New York, New York
October 10, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge